JEREMIAH O'BRIEN, plaintiff in error, *vs.* THE PEOPLE, defendants in error.

Where a juror on the trial of an indictment for murder, on being challenged for principal cause, stated that he had read a statement in the newspaper, of the homicide, but that although he had an impression that a homicide was committed, he had none as to the guilt or innocence of the prisoner; *Held* that the challenge was properly overruled.

The prisoner then challenged the juror for favor, and demanded triers. These having been sworn, the juror again testified that he had read the statement in the newspaper, without any impression remaining on his mind, of the guilt or innocence of the prisoner; that, "it would require evidence, either the one way or the other, to make him convinced of the prisoner's guilt or innocence." The prisoner's counsel requested the judge to charge that the challenge was well taken, as matter of law. The judge declined so to do, and submitted the question of the impartiality of the juror to the triers. *Held* there was no error in this; and that it was properly given to the triers to decide that question.

Another juror, being challenged for principal cause, testified that he had conscientious scruples in finding a verdict where the penalty was death; but that his scruples would not prevent him from finding a verdict of guilty of murder, where the evidence required him to do it; *Held* that the juror was properly set aside as incompetent.

Where a juror states that he has conscientious scruples against finding a verdict involving the penalty of death, he is directly within the inhibition of the statute, as to jurors serving who hold such scruples.

When a juror has conscientious scruples in finding such a verdict, his competency is not established or restored by a statement that he would render a verdict of guilty, if the evidence required it.

A juror, being challenged by the prisoner's counsel for favor, testified that he thought he read or heard the statement of the homicide, published in the paper, and believed that a homicide was committed by the person charged in the paper, but it left no impression on his mind, as to the guilt or innocence of the party. *Held* that the challenge was properly overruled; the result of the evidence being that there was no impression on the juror's mind, as to the guilt or innocence of the prisoner; the person charged in the paper not being identified as the prisoner.

An indictment charged the prisoner, in one count, with the murder of *Lucy McLaughlin,* and in another with the murder of *Kate Smith.* The counsel for the prisoner moved the court that the prosecution be required to elect upon which count the prisoner should be tried. The court reserved the question. It was proved that the deceased was usually known by the name of Kate Smith, but there was some evidence tending to show that her name was Lucy McLaughlin. At the close of the evidence the prosecution entered

O'Brien *v.* The People.

a *nolle prosequi* as to the count charging the murder of Lucy McLaughlin, and the jury found the prisoner guilty, upon the other count, of the murder of Kate Smith. *Held* that there was no error in this.

Confessions are excluded only when they are made under circumstances that tend to produce doubt as to their truth, arising from the operation of hope or fear in the mind of the prisoner. When made under the effect of threats, or the sanction of an oath, without the proper caution being given that he need not answer, and that what he says may be used against him, and some other circumstances, the admissions are excluded, as matters of law.

But where the admissions are purely voluntary, they are to be submitted to the jury for what they may be deemed worth.

A non professional witness was asked for his opinion as to the mental condition of the prisoner, at the time of the occurrence. His opinion was excluded. *Held* that the ruling was correct.

When insanity is interposed as a defense, it is not incumbent on the people to establish the sanity of the prisoner at the time of the commission of the offense, by affirmative evidence.

On a trial for murder the prisoner has no right to ask the court to charge the jury that they may infer, from the presence of intoxication, the absence of premeditation.

A charge that "if there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow, or whether it be contemplated for months," is a very sufficient definition of murder in the first degree, when occurring with premeditation.

*Delirium tremens*, like insanity, if it deprives one of the capacity to know what he is doing, or of knowing right from wrong, saves him from any criminal responsibility for his acts.

ERROR to the New York general sessions, to review a conviction for murder. The legal questions raised on the trial and decided in this court, sufficiently appear from the opinion.

*Edward D. McCarthy*, for the plaintiff in error,

*A. Oakey Hall*, (dist. attorney,) for the people.

*By the Court*, LEONARD, J. The prisoner's counsel challenged Blumenthal as a juror ; first, for principal cause, and secondly, for favor. The inquiries made of the juror tended

to show that the challenge for principal cause was for the purpose of showing that he had formed or expressed an opinion as to the guilt or innocence of the prisoner, but the ground of it was not stated by counsel. The evidence of the juror established very clearly that he had read a statement in the newspaper of the homicide, but that, although he had an impression that a homicide was committed, he had none as to the guilt or innocence of the prisoner. The judge very properly overruled the first challenge, and the counsel for the prisoner excepted to the ruling, and then challenged the juror for favor, and demanded triers. These having been sworn, the juror again testified that he had read the statement in the newspaper, without any impression remaining on his mind of the guilt or innocence of the prisoner. He then said "it would require evidence either the one way or the other to make him convinced of the prisoner's guilt or innocence." The prisoner's counsel requested the judge to charge that the challenge was well taken, as matter of law. The judge declined so to do, and submitted the question of the impartiality of the juror to the triers, who found him competent. The evidence of the juror was, substantially, that he had no impression as to the guilt or innocence of the prisoner and that it would require evidence to enable him to find a verdict. Coupled with the evidence that he had no impression, the statement that it would require evidence before he could find a verdict, does not prove a bias upon the mind of the juror against the innocence of the prisoner, so as to reduce his competency to a simple question of law, to be determined by the court, and not by the triers, as a question of fact.

To "require evidence the one way or the other to make him convinced," although an awkward use of language, is free from any expression of favor, bias, or partiality. I think there was no error, and that it was properly given to the triers to decide as to the indifference and competency of the juror.

After the verdict of the triers, the prisoner's counsel withdrew the challenge, and the juror was sworn in the cause. It

is difficult to say why the challenge was withdrawn; and if it had appeared to be well taken, I should not be disposed to deprive the prisoner of the benefit of the previous exception to the refusal of the court to charge that the challenge was well taken.

George Warner, another juror, was then called, and challenged for principal cause. He testified that he had conscientious scruples in finding a verdict where the penalty is death. He further testified, in answer to inquiries by the prisoner's counsel, that his scruples would not prevent him from finding a verdict of guilty of murder where the evidence required him to do it. The court held the juror to be incompetent, and the prisoner's counsel excepted to the ruling.

Where a juror states that he has conscientious scruples against finding a verdict involving the penalty of death, he is directly within the inhibition of the statute, as to jurors holding such scruples. It is impossible to know what evidence a juror with such scruples would consider requisite to bind him to render a verdict of guilty, when death would be the penalty to follow from the verdict. When a juror has conscientious scruples in finding such a verdict, his competency is not established or restored, by a statement that he would render a verdict of guilty if the evidence required it. His standard of required evidence is unknown, and may be as far removed from the legal and general sense of justice as are his scruples. (*Walter's case*, 32 *N. Y. Rep.* 161. 33 *N. Y. Rep.* 501, *opinion of Campbell, J.*)

Wm. H. Bluhdorn was then called as a juror, and challenged by the prisoner's counsel for favor. Having been sworn, the juror testified that he thinks he read or heard the statement of the homicide published in the paper, and believed that a homicide was committed by the person charged in the paper, but it left no impression on his mind as to the guilt or innocence of the party. The court thereupon overruled the challenge, and the counsel for the prisoner excepted. The result of the evidence was that there was no impression on his mind

as to the guilt or innocence of the prisoner. The person charged in the paper is not identified as the prisoner. The juror, not appearing to have any knowledge of the prisoner, has not, from reading a statement of a homicide in a newspaper, any impression of his guilt or innocence. The newspaper account of a homicide, accompanied with the name of some person charged with it, does not, even if the juror believes the account, necessarily imply that he has any opinion as to the guilt or innocence of the individual who has been indicted.

These were the only objections to the competency of the jurors, brought before this court for review. There appears to be no valid objection to these rulings.

The indictment charged the prisoner, in one count, with the murder of *Lucy McLaughlin*, and in another with the murder of *Kate Smith*. The counsel for the prisoner moved the court that the prosecution be required to elect upon which count the prisoner should be tried, whether for the murder of Lucy McLaughlin or Kate Smith. The court reserved the question, and it is now urged that this was error. During the trial, evidence was given by the prosecution that the deceased was usually known by the name of Kate Smith, but there was some evidence tending to show that her name was Lucy McLaughlin. At the close of the evidence, the prosecution entered a *nolle prosequi* as to the count charging the murder of Lucy McLaughlin, and the jury found the prisoner guilty, upon the other count, of the murder of Kate Smith.

There is no difference in the two counts, except in the name of the deceased. It is the same occurrence, as to time, place and manner. There is nothing to mislead the prisoner. The use of different names for the deceased, in different counts, when every other circumstance of the homicide charged is identical, cannot lead to any mistake respecting the particular offense charged in the indictment. Of course, two such offenses could not be tried under the same indictment, nor could there have been any such misapprehension in this case. It is the practice in criminal pleading to charge

O'Brien *v.* The People.

the same offense in different ways, in order to meet the proof at the trial, as it may transpire. (*Wharton's Treatise,* § 414, 416.) There was no error here.

It is also objected that confessions of the prisoner were improperly admitted. The prisoner, immediately after the commission of the homicide said, in the presence and hearing of the officer who arrested him, that he "did it," meaning that he had committed the homicide. The next day he admitted to the same officer that a letter was written and sent by his direction to the deceased, which had been found in her room, and immediately after the homicide read, in the hearing of the prisoner, by the officer. At the time of his arrest, immediately after the occurrence, he also said that he wrote the letter. The conversation at the place of the homicide, which elicited the confession, was not addressed to him. Some one there remarked "Jerry is going to die;" the officer said he thought not; he was worth two dead men yet; that it would probably cost the county a good deal to try him. The prisoner appears to have taken offense at this, and came at the officer, but was easily restrained by the girls who were present, and he lay down on the floor. He said he "did it, and was going to plead guilty to save the county the expense of trying him." At this time he was prostrate and feeble. The next day, at the hospital, the officer told the prisoner he had come for him to go to the coroner's inquest; he also told him that he had his letter to Kate Smith, and then showed it to him. The officer also said to the prisoner, "your case is a hard one." The prisoner said, in substance, that he wrote the letter, and that he meant to plead guilty.

The writing and sending of the letter by the prisoner to the deceased a few minutes only before the homicide, was clearly proven by the other evidence, as was also the commission by him of the homicide. The statements of the prisoner added very little, if any thing, to the certainty of the proof. They appear to have been wholly voluntary. At the time of the homicide, it may be said that his remarks

were volunteered. The fact of the homicide was too plain for denial. No one can entertain the slightest doubt that his statements were strictly the truth, for they were fully corroborated by other evidence. I am unable to perceive that the prisoner was actuated in making his statements in the slightest degree by hope or fear as to the result of the homicide affecting himself. Confessions are excluded only when they are made under circumstances that may tend to produce doubt as to their truth, arising from the operation of hope or fear in the mind of the prisoner. When made under the effect of threats, or the sanction of an oath, without the proper caution being given that he need not answer, and that what he says may be used against him, and some other circumstances, the admissions are excluded, as matters of law. But where the admissions are purely voluntary, they are to be submitted to the jury for what they may be deemed worth. Such appear to be the character of these admissions, and I think they were properly left to the jury.

Some questions were raised in respect to the sanity of the accused. A non-professional witness was asked for his opinion as to the mental condition of the prisoner at the time of the occurrence. His opinion was excluded. This ruling was correct, as it appears from authority. (*De Witt* v. *Barley,* 9 *N. Y. Rep.* 371. *The People* v. *Lake,* 12 *N. Y. Rep.* 358.)

The prisoner's counsel asked the court to instruct the jury that " Where insanity is interposed as a defense, the affirmative of the issue is with the people, and they must establish the sanity of the prisoner at the time of the commission of the alleged crime, by a preponderance of evidence." The contrary rule is declared by the Court of Appeals in *Walter* v. *The People,* (32 *N. Y. Rep.* 147.)

The prisoner's counsel also asked the court to charge, " that the jury might infer from the presence of intoxication the absence of · premeditation." This request was also against the decision of the Court of Appeals in *Kenny* v. *The People,* (31 *N. Y. Rep.* 330.) After the jury had retired, they again

came into court, and one of the jurors asked the court to instruct them how much premeditation is necessary to constitute the difference between the first and second degrees of murder. The judge stated to them that the Court of Appeals say : " If there be sufficient deliberation to form a design to take life, and to put that design into execution by destroying life, there is sufficient deliberation to constitute murder, no matter whether the design be formed at the instant of striking the fatal blow or whether it be contemplated for months." It was said at the argument, that this definition was read from the report of a case decided before the act now in force, respecting murder in the second degree, was enacted. It is, however, a very sufficient definition of murder in the first degree, when occurring with premeditation. The statute has given no definition of murder in the second degree, except a negative one ; that it is not murder in the first degree, nor any of the degrees of manslaughter. The judge might have instructed the jury, less favorably for the prisoner, that murder in the second degree could not occur, where the homicide was committed with premeditation.

One of the jurors also asked the court below to be instructed upon this further question : " Is a person under *delirium tremens*, of sound mind in the meaning of the statute ?"

The judge, after reading several passages relating to drunkenness, also read to the jury the following passage from a case in the Court of Appeals, as his instruction in answer to the said request : " It is a duty which every one owes to his fellow men and to society, to say nothing of more solemn obligations, to presume, so far as it lies in his power, the inestimable gift of reason. *If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable.* But if, by a voluntary act, he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which, in that state, he may do to others or to society."

One of the witnesses testified, that delirium caused by in-

toxication was a symptom resembling moral mania, in some instances ; and that he regarded it as a species of temporary insanity.    There was no evidence that the prisoner was suffering from delirium tremens, at the time of the homicide. About the first week in June he was with the Fenians on the borders of Canada, and having called on a physician, stated that he had no appetite ; could not sleep ; restless ; saw occular spectres ; fancied he saw things ; and had been drinking for some days.    The doctor formed the opinion that he was suffering from an incipient attack of delirium tremens.    Another said he looked wild and excited, just before the killing : another, who drank liquor with him shortly before the occurrence, thought him under the influence of liquor.    There was no evidence that the prisoner had delirium tremens at the time of the occurrence.    There was some evidence that such delirium, where it existed, might amount to moral mania, and that it was a predisposing cause to insanity, but none that the prisoner was so affected.    The jury had been previously correctly instructed on the subject of insanity.    There was nothing in the evidence calling for any instruction upon the particular subject to which the inquiry related, and I am at a loss to know why the inquiry was made.    There was but a small part of the citation read by the judge that had any reference to the inquiry.    All that related to drunkenness, was wholly foreign to it.    If any instruction had been requisite, it should have been to the effect that delirium tremens, like insanity, if it deprived the prisoner of the capacity to know what he was doing, or of knowing right from wrong, saved him from any criminal responsibility for his acts.

No other objections were urged as grounds for reversing the judgment of the general sessions, and in my opinion none of these are well taken.

The homicide was a brutal murder, without any qualifying circumstances, and no injustice has been done by the conviction.    The judgment should be affirmed.

[NEW YORK GENERAL TERM, January 7, 1867.  *Leonard, Ingraham* and *Clerke,* Justices.]